Good morning. Welcome to the Ninth Circuit. We are pleased to have Judge Barbara Rothstein of the District Court here in Seattle sitting with us today. We will take the cases in the order they appear on the calendar. The first one is Meza v. Barr. As I assume you know, you should reserve time if you want to, but we are not going to reserve it for you. So you should watch your time. And the secret is, if you use up your time, I will give you a minute of rebuttal anyway. Okay. Go. Luis Cortez Good morning, Your Honor. Luis Cortez for the petitioner, Mr. David Meza. I would like to reserve two minutes for rebuttal. Your Honor, with the Court's indulgence, I would like to focus my presentation with you today on two main points of the BIA's decision. The first one is the political opinion and how the Board came to that conclusion, and the second one is the nexus issue and how they came to the conclusion of whether our client was attacked on account of a political opinion. Starting with the political opinion claim, there's two points that I want to highlight for the Court. First, the Board of Immigration Appeals and the immigration judge characterized his political opinion as just refusing a job offer, and the petitioner respectfully submits that he did more than just that. Well, there's a weird thing about the record here, which is that in the declaration, he gives us a specific account of what he said, but at the hearing, he didn't. Yes. Right? So aren't we bound by the hearing, not the declaration? No, Your Honor, and for two reasons. I'm sorry, what? No, Your Honor, and for two reasons. First, it is common practice in the immigration courts that when a declaration is submitted, then the testimony is there to support and supplement the rest of the application and the rest of the evidence. Certainly, the Department of Homeland Security could have used that to try to discredit his testimony saying, you said it in the declaration, why are you saying it now? But it wasn't discredited, and the immigration judge took his testimony as credible. Two, and I think it's the most important. He didn't, neither the immigration judge nor the BIA mentioned this dialogue that's in the declaration about, you know, I told him, you know, I'm a public servant and I, you know, and which was not in the hearing transcript, and why can't they do that? I mean, he didn't affirmatively put it on at the hearing. I know, I've seen the declaration used to cross-examine, but it can be used in addition to what was actually said at the hearing? Yes, Your Honor. Do you have any authority for that? Well, Your Honor, the BIA, when they cited what he said or his expression of the political opinion, they cite the transcript and they also cite the exhibit, and the exhibit was his declaration. And so the BIA used both the exhibit, his declaration, and the transcripts, which they specifically cite to in their decision, in order to address how he made the political opinion. So I think that this Court can and should look at both of those because... All right. Why don't you go on on that premise, but I was surprised by it. I thought that he had to put on at the hearing the evidence, that he couldn't just rely on the declaration. I hear what you're saying, the government could have brought that up and cross-examined him on it, and they didn't, so, but I found it surprising. Go ahead. Yes, Your Honor. So with that, our position is that he did more than just refuse a job offer when he made his political opinion because of the statements he made. But even if we're just looking at refusing a job offer, the Board of Immigration Appeals conclusion that it cannot be a political opinion is incorrect because the Board essentially makes a blanket rule saying, if you decline a job offer, if there's nothing else but declining a job offer, it cannot be a political opinion. And it cites Lee and Grava for that proposition. And that cannot be so, because Grava outlines some other factors about when the political opinion is expressed, to whom is it expressed, and whether it's to a larger institution or whether it just happens to be to one corrupt political official. But it doesn't say that the way that it was expressed cannot be a categorical non-political opinion. And in fact, we see, we can think of situations where a political opinion would be expressed and under the Board's rule, it would still be denied. For example, if we have some high political figure who says, I will give you this job offer if you, you know, as long as you work with our ideology and follow the agenda that we have politically, and someone says, no, I decline, I refuse that offer, that could be a political opinion. It could be, but that isn't what happened here on either account, right? Because the police commander or instructor or whatever offered him the job and said, and you don't have to, you know, you can just do it now. But he didn't say, and you have to, you know, participate, he didn't directly say you have to participate in our corrupt activities. Two answers to that, Your Honor. First, that the Board of Immigration Appeals said that a refusal of a job offer is what makes it not a political opinion. All the other factors that came with the refusal didn't seem to matter to the Board. They just said refusal of a job offer, there's nothing else, it's not a political opinion. Now, the Board could have explained all the other factors of what didn't happen or other reasons that it disagreed, but it cut short of that and it said, because all we see is a refusal of a job offer, that cannot be a political opinion, which is an unworkable test. In fact, Your Honor, there are other components that the Board could have relied on, like And I take Your Honor's point about, you know, he didn't say you have to follow our agenda, and so in what way would this, declining this political opinion, would be a political opinion under this Court's precedent. And I think Grava is good for that, because what Grava says is that when you express the political expression that you're making, it has to be towards the government and towards a larger institution. It can't just be to a one corrupt police officer who's trying to do something on the side, for instance. And in this case, Your Honor, we think that that meets this test, because what the commander was trying to do is he was giving him a job offer, and in his testimony and in his declaration he said, you know, we'll give you a uniform, we'll give you a gun, you can start working as a police officer now. There's so much that needs to happen in order for someone to have all of that, that it is inextricably put together, it's intertwined with government function, to give someone a uniform, to give someone a gun, to have someone work these public functions of high public trust. It would be as if someone says, I will make you a judge, though you have not qualified for any of it, and I will give you this position, and you would publicly hold yourself out as a judge. That is just not a single job offer. There's so much interworkings that must happen with that to have that government position. Plus the fact that he never did get the job afterward. Right, Your Honor. And I think that really goes to my next point of nexus. And Your Honor, I think that the fatal point of the BIA and the IJ's analysis was that they were analyzing each part in sections. They said, well, the taxi, you know, they didn't say that it had anything to do with the commander, they didn't really say anything about that. The threatening phone calls, the fact that the only other place that the petitioner said that his phone number, his home phone number was listed, was the application he submitted to the police academy, that it was unlisted anywhere else. And so looking at those individually, the immigration judge said, and the BIA agreed, that because there was no direct evidence of anything relating to the police commander, that there is no nexus. But in cases like Madrigal, where the circuit said that we cannot look at these things in the totality of the circumstances, the Board of Immigration Appeals did not do that. And I think further, Your Honor, in... But why do you say, I mean, I just don't see the basis for that assumption. They obviously were familiar with the entire record. I mean, I think the BIA could easily have come out the other way, but they said on this record your client is basically just speculating as to the connection. And I guess I'm not sure what is it that you would point to, to say that they're not permitted on this record to reach that conclusion. Yes, Your Honor. I would rely on cases like Deloso, where it looks at timing. They look at the timing of the events. And so though the Board of Immigration Appeals could have looked at these incidents and said, okay, we could have gone the other way, which admittedly then, if reasonable bias may differ, then this court is bound by that. But the one thing that the Board did not address, and the immigration judge did not address, was the very suspicious timing that happened with all of this. He had no problems before all of this. And it just so happens that once he tells the police commander no, then all of a sudden he gets beat up. His father starts having threatening phone calls. His father was beat up. Why wouldn't, if in fact there was the connection, why wouldn't there have been some indication from the persecutors that, hey, pal, we're sending you a message, by the way? You know, I mean, that's just a little bit implausible. I understand why the BIA was wanting more to link it up. Because if your theory is right, wouldn't we expect the attackers to have said something? Your Honor, when we're talking about political corruption and in a political opinion claim, there is incentive and motivation for the government to not show their hand and say, hey, we're actually doing this because of the corrupt motive. If anything, the government has the incentive. But then it becomes, I mean, either they were trying to induce him or someone else to do something like participate in their corruption, in which case at some point it would have to be known that it was the government who was doing this or watch out because if you don't go along with this, they're going to do this. Or even if it was the police who were doing it, they were still doing it, you know, as part of their overall criminality, not because they were trying to be, not because of his political ability. In other words, why would they be doing this secretly? What would be in it for them? Yes, Your Honor. And I'm running out of time. No, go ahead. Your Honor, I would disagree with the premise that they were doing it to try to induce him. He did say that the reason I'm not doing it is because of the morals of the police and that the commander was upset by it, as he describes. So our position is that it was done to punish for his statements. And so as long as the punishment is being carried out and the government is made aware that this punishment is being carried out, then, you know, that seems to be the larger purpose than saying, you know, this is why we're doing it and, you know, we are corrupt and doing this. And so, Your Honor, that the, and I think the, and I'll surmise and then sit down and rest of it, save the little time, the, the point here is that the board didn't even look at that. They could have said that. And so they didn't look at the timing. They didn't mention timing. And the, um. They also didn't mention the phone, the telephone number, they didn't mention the circumstances of how the taxi was later found, they didn't mention, um, much of any, they didn't mention the threats. They didn't mention the fact that they, that the father was later hurt. Your Honor, and so if we're looking at whether substantial evidence supports a finding that, um, there is, uh, he was not persecuted on account of a political opinion, there is no substantial evidence. Okay. You sit down and I'll give you a minute of rebuttal. Thank you so much. It was a nice job. Yes. Good morning. And may it please the court. I'm Lori Warlick and I'm here on behalf of the United States Attorney General. Uh, the court should deny this petition for review for many of the reasons the court has already referred to. Could you answer my question about whether something that's at, in the declaration but not said at the hearing is part of the record in this case for our purposes or isn't? Respectfully, I believe it is part of the record. It is? It is. So the fact that you didn't say it at the hearing doesn't matter? It only matters insofar as you can see that there, although there is no adverse credibility determination here, um, when the, he's testifying and he speaks to certain things that are different from the declaration or at least sort of related to, but not exactly, exactly. You can look to compare these to see just how reliable the evidence is. Well, the IJ or the AL or the BIA decode, but it didn't. So in other words, they didn't question or nor did the government lawyer. Um, so it's not for us to go say, uh, well, what's in the declaration is, is not to be taken into account. I mean, if, if it's otherwise would be, isn't true, that's not up to us. Well, I would feel that, um, when you're looking at the evidence to determine whether that's, that's the question of adverse credibility and as you referred to, like comparing a declaration to testimony to see if it's whether the person is intending to lie. Now the person may not have a proper recollection and it evolves. Yes, but that's not our job. And maybe the government could have done that, or the IJ could have done it or the BIA could have done it, but nobody did it. Nobody said that because he didn't testify to what was in his declaration, uh, what was in his declaration shouldn't be taken as true. That was never even argued as I understand it. Correct. But for example, in my opening brief, I referred the court to the fact that he said in his declaration, that's the only time he actually made it sound like the, um, the commander referred to anything nefarious in his job offer. Right. Exactly. But when he testified, he said, um, I don't think there was enough there to say that this person was not telling the truth about what he said, but. Do you think we can take the IJ or the BIA as having determined that what was in the declaration wasn't so? I think if the BIA did not enter an adverse credibility determination, it is true. Or even on a discrete basis say that what was in the declaration wasn't true. I would say that the court has the authority in reviewing the reliability of evidence and just the weight of evidence to say whether the court finds that the evidence compelled a certain conclusion, you can look to say, well, he's only mentioned once that he said something bad. Did he really say that? Is his recollection correct? I know he's not trying to lie to us, but is his recollection correct? Well, you're reviewing for compelling evidence, whether the evidence compels a particular conclusion. And when you look at the evidence in the totality, it would include the fact that in the declaration at page 403, he suggests that the, the commander apparently suggested you can do some good, you can do some bad. But in the transcript, he said it was much less clear about the illegality of what he was asking. That's definitely true. And that's why I'm asking the question. I don't believe, the point being, I don't believe that this Petitioner intended to tell something false. Well, if he said what was in the declaration, would that be sufficient that, which is never mentioned in the IJ or ALJ opinion at all, would that be sufficient to demonstrate a political opinion? Well, not based on the fact that this is an aberrational corrupt officer. So him saying, you can do some good, you can do some bad, without him saying more, saying, well, what do you mean? I mean, how bad are you describing? Well, there's certainly some material on the record to support the fact that this police force is pretty corrupt. As my recollection was that half of it was fired about a year or so later. Well, I'm not sure. I mean, that's not part of the record about the country conditions. Well, about his police academy or the police force? About the police force, yes. Well, I'm not sure that the police academy is a feeder for that police force. Well, he said that this guy was in the police force. No. He said he was an instructor. I don't believe he actually was an officer. And a mentor. My understanding was he was in the police force, and in that guy's he was teaching this. Maybe I didn't, maybe that's not true. Well, let me take it, let me take it a step further and address what you said about it being a sporadic thing. The guy ends up being beaten up just shortly thereafter. He ends up not being offered a job at the end of his career, at the end of his term in the academy. His father ends up getting beaten up. Don't you think that may be evidence that it's more than just a sporadic group of officers? Well, the only person that ever said anything to him that made him question whether someone was corrupt in this academy was the single commander or instructor. Let's assume he's part of the police force, right? So the timing is the only thing. When I reviewed for this case, I said, am I missing something? Am I missing some evidence that ties this attack on a taxi driver, the petitioner, and the subsequent desire for the subsequent phone calls demanding money and threatening him further back to this academy? And the only thing that supports the claim is the timing. Is the timing. No, it's not just the timing, right? It's the phone number. The phone number, sure. I'm sorry. Well, and that's, how do you address that? I would say that it, respectfully, it strains logic to think that the only place someone could get his home phone number is the one, is his police academy application. Did the IJ or BIA address that argument, though? I don't believe the BIA addressed that specifically because it wasn't part of the dispositive process. And also, I thought there was more than that. I mean, first of all, this whole thing, I mean, this is what I understand he's saying anyway. He's saying, first of all, that there was this robbery and potential kidnapping seemed to be planned because there's this woman who's making text messages and so on. So there was some kind of a conspiracy, he's saying. Second of all, he's saying, the phone calls. Third of all, I understood him to be saying that the way in which the taxi was found suggests, indicates that the police knew all along where the taxi was, but didn't tell him. And let him think that it hadn't been found, and therefore, when these people were calling him and telling him to come here and get the taxi, they were essentially had set that up because if they had told him right away that they had the taxi when they had the taxi, that would have been a useless endeavor. So... Well, I believe, I mean, I think it's perfectly reasonable to think that there was a conspiracy to commit a carjacking or robbery of a cab driver, but the question is whether that was at the behest of the commander who tried to get him to the job. But that ties it to the police in the sense that the police had a taxi all along. Right. For a long time before he found out. I think that, and also, again, the issues with this record and the evidence... And why wouldn't they tell him? And why wouldn't they tell him? Well, the issues with, I mean, my first thought is I'm a government employee, bureaucracy happens, you know, that a car gets impounded, there's no, he says he had no identifying information in it. I mean, maybe someone was not on their job that day very well and didn't go and search the database. The other thing that's striking is how little of the story is in the BIA opinion, and none of what we just mentioned, plus the I.J. says nobody harmed his family, but in fact, he said... That was incorrect. They did harm his family. They don't mention the threats, or the phone calls at all, the BIA just doesn't mention it. Either that there were phone calls from a number that's questionable, but also that there were threats for quite a while. They don't mention that. Well, the immigration judge alluded to many of those points, and the board... Some of them incorrectly, though. I'm sorry? Some of them incorrectly, like nobody was there. That was the one incorrect point, but the point being, that was still related to whether there was a nexus between what is obviously an unfortunate circumstance. I mean, this is... The timing is bad. It's unfortunate. I mean, I would say that somewhat... But bad things happen around the same time, and you can't make the logical leap without some indication that they're connected, and we have always said that a persecutor's statements serve as the best evidence of what they are doing, and they never said anything. When he was asked about this twice during his testimony, he gave two non-responsive answers and never said what the people who were robbing him said to him. So, plainly, they weren't saying, you know, we can do this to you, don't forget, Commander Nacho is watching, anything like that. Do you really think they would go even further, having offered him to join a conspiracy of corruption, and he turns them down, and he says, you know, you're a bunch of bad guys and I don't want to have anything to do with you. How much more are they going to say to him? I think they would at least... I mean, there's no point in doing this. The reason we're beating you up is because you turned us down. Or at least allude to something about their power, something about their authority, because what's the point? Even to punish him, why would it continue on? Punish him and keep him quiet. Well, I mean, he had never blown any whistle about it to begin with. He never reported the Commander's statement to him at all anyway. What would make them think that he would go do it now? I mean, the police... Another point I'll make is that when he came back and he told the Academy, I got robbed, my cab was stolen, and I will note that once they got his cab, they may have been intending to kidnap him as well, possibly for ransom, but once he ran away, they did not pursue him. They took his car. And then they continued to ask for money. And this is a side note that sort of supports the theory that maybe the phone calls were from the same people who robbed him, but that still doesn't mean they're from the law enforcement. They were asking him to come get the car. Both. And? They asked him to come get the car. They said, we got your car. You should come here. He asked for more information. Apparently, he wouldn't give it to him. He said, I don't think this is legit. And then they said, well, then we're going to kill your family or you're going to give us 50,000 pesos. That was his father's declaration. Well, I thought they told that to the father at some other point. They threatened the father, yes. With the same people. But I thought when they were talking to him, they were only talking about come get the car. I'm not sure if it's been divided out that much. Which was essentially trying to get him back with them, even though he didn't have the car. I mean, if they really wanted the money, they would have asked for the money. That's not what they asked for. They asked him to come there. I have a feeling, I mean, based on all of our understanding, these, kidnapping for ransom is probably a higher dollar than just a robbery. But I'll point out, and then I will sit down, is that when he told the Academy I got robbed, no one, he never said that the commander then looked him dead in the eye and said, I know, or I figured, or I've heard, or anything to allude to this being connected to him. Apparently the Academy thought, well, that's too bad, and come back to class. So with that said, I'll just... I think that's what bothers me the most is that the BIA didn't grapple with any of this. I'm sorry? The BIA opinion doesn't deal with any of the indices at all. It just says nothing. I think the BIA was very much focused on the legal conclusions based on the aberrational rejection of an aberrational, corrupt law enforcement officer, plus the fact that the leap from suspicion to evidence is not there. But even there, it doesn't deal with what was said in the declaration. The IJ, I will say that at least the IJ said, even if I don't refer to what is, I've listed here, I have reviewed everything and I'm considering the record as a whole. And then the board, when they reviewed the IJ's decision, certainly considered the record as a whole because they said, they specifically said, we will not be speaking to these other things because these are dispositive conclusions that resolve the issues at hand. Okay. Thank you so much. We ask the court to deny the petition. Thank you. Thank you very much. Sir, we'll give you one minute of rebuttal. I'll try to do it quick in 30 seconds. First, Your Honor, I would like to point the court to Administrative Record 3 and 59. And that's the BIA decision and the IJ decision, and they both specifically mentioned the declaration. And so it looks like they both of them did take it into the account. Second, Your Honor, this is the exact same scenario, the type of situation that Popova looked at, where Judge Pregerson talked about timing. And the BIA in the same way said, look, there's all these kind of isolated incidents, and the BIA had denied for that reason. And Judge Pregerson said, we have to look at timing. Timing is very important. And I would submit to the court that it becomes... It's not timing, but it's not a be-all and end-all. No. And I agree with Your Honor. But when we're looking at the process of evaluating whether a corrupt political opinion claim was the reason for the persecution, and there's reason to try to hide that publicly, then timing is very important here. Okay. Thank you very much. And thank you both for really a very helpful argument, which we often don't get in the immigration cases. So thank you. Maitza versus Barr is submitted, and we'll go to United States versus Haskell.
judges: Berzon, Watford, Rothstein